2023 UT App 44

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DALTON JAMES AIKEN,
Appellant.

Opinion
No. 20190678-CA
Filed April 27, 2023

Second District Court, Ogden Department
The Honorable Camille L. Neider
No. 181902032

Emily Adams, Freyja Johnson, and
Cherise Bacalski, Attorneys for Appellant

Sean D. Reyes, Kris C. Leonard, and Jonathan S.
Bauer, Attorneys for Appellee

JUSTICE DIANA HAGEN authored this Opinion, in which JUSTICE
JILL M. POHLMAN AND JUDGE RYAN M. HARRIS concurred.[1]

HAGEN, Justice:

¶1     Around 3:00 a.m. on an August morning, Dalton Aiken
and his friend, Cory Fitzwater, set out to "fight a homeless guy."
They searched a wooded area near Ogden's 21st Street pond for
encampments and found the victim asleep next to a campfire.

---

1. Justices Diana Hagen and Jill M. Pohlman began their work on
this case as members of the Utah Court of Appeals. Both became
members of the Utah Supreme Court thereafter and completed
their work on the case sitting by special assignment as authorized
by law. *See generally* Utah R. Jud. Admin. 3-108(4).

According to Aiken, Fitzwater woke the victim and shot him in the head with a .45 caliber handgun.

¶2 After the shooting, the pair tried to leave the area in Aiken's truck, but they were stopped by police on suspicion of marijuana possession. Aiken was arrested, and a search incident to arrest revealed .45 caliber bullets in his pocket.

¶3 Once the police discovered that a man had been shot to death nearby, they suspected a connection and questioned Aiken about his involvement in the shooting. In his interviews with police, Aiken gave multiple accounts of what had occurred that night, but he eventually told police that he had witnessed Fitzwater shoot the victim.

¶4 The State charged both Aiken and Fitzwater with the victim's murder. Each man proceeded to trial separately, and both were convicted. This appeal concerns only the case against Aiken.

¶5 Aiken argues on appeal that his trial counsel provided ineffective assistance by not objecting to the admission of crime scene reconstruction evidence and the testimony of the victim's mother. We conclude that Aiken cannot establish that he was prejudiced by the crime scene reconstruction evidence or that counsel performed deficiently in not objecting to the mother's testimony. Therefore, his claims of ineffective assistance of counsel fail.

¶6 Aiken has also submitted a motion under rule 23B of the Utah Rules of Appellate Procedure, seeking a remand to support additional claims of ineffective assistance of counsel. He argues that his counsel's failure to request a unanimity instruction and failure to call an expert witness as to false confessions was deficient and that the deficient performance prejudiced his trial. Because Aiken has not alleged nonspeculative facts that are not apparent from the record to support his argument that counsel was deficient in not requesting a unanimity instruction, we deny

the motion in that respect. With respect to his claim that counsel should have called an expert witness, Aiken has not shown a reasonable probability that admitting expert testimony would have affected the jury's verdict. Accordingly, a remand is not warranted, and we affirm Aiken's murder conviction.

BACKGROUND[2]

¶7      Just after 4:00 a.m. on August 16, 2018, Ogden City police officers were dispatched to the 21st Street pond area in response to a 911 call reporting that "a male in a large Army tent" had suffered a head injury. The caller guided the officers through a wooded area to the victim's camp. The path through the woods "was difficult" and the officers "wouldn't have been able to find [the injured male] without" the caller guiding them. It was very dark and, even with a "police flashlight," the officers could "just barely . . . see through the trees."

¶8      When the officers arrived at the victim's campsite, there was no active fire, but the coals were warm. The victim was lying by the firepit next to a mat that was covered in blood. The officers determined that the victim was dead and had suffered a gunshot wound to the head. No one else was at the campsite, but police found a .45 caliber shell casing near the body.

*Aiken's Arrest*

¶9      Earlier that morning, at around 2:30 a.m., a Weber County Sheriff's deputy was on patrol near the 21st Street pond. The deputy, who "frequently check[s] for illegal activity" in that area,

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Garcia-Lorenzo*, 2022 UT App 101, n.1, 517 P.3d 424 (cleaned up), *cert. granted*, 525 P.3d 1263 (Utah 2022).

noticed a white truck in a parking lot that "leads to a trailhead system." On the driver's seat of the truck, the deputy "observed a Ziploc baggie with a green, leafy substance" that appeared to be consistent with marijuana, along with a gun magazine. The deputy could also smell the odor of marijuana while standing next to the vehicle. The deputy returned to his vehicle but kept an eye on the truck.

¶10    About forty-five minutes later, the deputy saw two men return to the truck and drive away. The deputy followed and, after observing the driver commit a traffic violation, pulled the vehicle over. Aiken, who was driving the vehicle and admitted that the marijuana belonged to him, was arrested for possession of marijuana. In a search incident to arrest, the deputy found a handgun and two magazines inside the truck and three .45 caliber bullets in Aiken's pocket. Aiken's passenger, Cory Fitzwater, was allowed to leave.

*Aiken's Statements*

¶11    While Aiken was being held in jail for marijuana possession, detectives investigating the murder at the campsite reviewed the report from Aiken's traffic stop and suspected a connection to the murder. About ten hours after his arrest, Aiken was taken from the jail to an interview room at the Weber County Sheriff's Office where he was asked what he and Fitzwater had been doing near the 21st Street pond. Aiken initially claimed that they had gone to the area to walk around and smoke marijuana. One of the detectives asked, "Did you guys hear any commotion or anything out there?" Although Aiken had not yet been told about a death in the area, he responded, "Well, I kind of have a feeling that I know what you guys are after. But did someone get killed? I mean, so I heard a gunshot for sure."

¶12    Although Aiken knew that the victim's camp was east of the parking lot, he told officers that he and Fitzwater had walked west. He denied going into any encampments and claimed they

"never came face-to-face with any" "homeless people." When asked about the gun found in his truck, Aiken said it belonged to Fitzwater. Aiken claimed that the bullets found in his pocket were from target practice earlier that day and denied that they took the gun with them on their walk.

¶13   But as the detectives revealed more details about the murder investigation, Aiken changed his story to account for that new information. When asked, "[W]ould there be any reason why we would find a spent shell casing that matches the gun you guys had at the scene of what we're investigating?" Aiken responded, "I'm going to come clean right now, okay?" Aiken then told the detective that Fitzwater had left Aiken behind on the trail and "that's when [Aiken] heard the gunshot." According to Aiken, Fitzwater reappeared after the gunshot and "seemed more calm and relaxed," then both men left the wooded area together.

¶14   When the police questioned Aiken's story "that you guys randomly showed up at this random spot to randomly smoke some marijuana, ran into a random camp, and shot some guy," Aiken responded, "Yeah. That sounds bad," and changed his story again. Aiken admitted he had followed Fitzwater into the camp and explained that the victim was sleeping on the ground outside of a tent and next to a fire that "looked like it pretty much went out." Aiken admitted that he was there when Fitzwater shot the victim.

¶15   Aiken was later transported to the Ogden City Police Department for a second interview with a new set of detectives investigating the murder. He was told that Fitzwater was also in custody and was being interviewed in a separate room.

¶16   Aiken told the detectives that he was "going to spill out the entire story" and asked if he should "get something" out of it. Aiken repeated that he and Fitzwater had gone to the 21st Street pond to "just go out to the river and smoke," but they

brought "a sidearm because . . . there's homeless people out there." He claimed that he was following Fitzwater, who had been holding the gun close to his chest, when Fitzwater left the trail and "stumbled" onto a big tent. Aiken said he stayed about twenty yards back from the camp but could see a man sleeping on the ground between the tent and a smoldering campfire. Despite the darkness, Aiken was able to describe the victim as "a white guy, maybe halfway shaggy looking" or "maybe [with] a full face." According to Aiken, Fitzwater mumbled something about a cat, the victim began to get up, and Fitzwater "shot the guy."

¶17    When asked why he and Fitzwater went to that area, Aiken responded, "[T]here's always been talk of like the homeless. But I never thought it would amount to that. But I knew there was that kind of talk going on. But never like shooting somebody." Aiken reiterated that they went to the river "to enjoy [them]selves and to smoke pot" but added, "I think in [Fitzwater's] mind it was to kill somebody." The detective told Aiken not to speculate about what was in Fitzwater's mind, but to say only what he knew. The detective asked again, "Why did you guys go to the river? You had to have talked about it?" Aiken responded, "Yeah. Okay. To fight a homeless guy."

¶18    Aiken then backtracked, saying that fighting "a homeless guy" "wasn't the plan," but that "it was in the back of both of our minds probably." The detective asked whether Aiken and Fitzwater had actually talked about it, and Aiken replied, "Yeah, I think we did probably. I don't remember talk[ing] about it, that's the thing. But I'm sure we did. That was our motive. But I don't remember specifically exactly what was said. I swear to God." When pressed for details, Aiken said, "We wanted to pick a fight with homeless people. [Fitzwater] probably said some violent things, kind of like he wanted to kill them, I'm sure," but "I don't remember exactly." The detective asked what Aiken had said in response, and Aiken replied, "There was never a plan to murder,

but there was a plan to hurt. . . . To just go and find some and beat them up." He then backtracked again, "I really wasn't planning on doing that. That was always just talk. You know?" He said that he and Fitzwater went there "[t]o be tough guys, try and scare a homeless guy, beat him up. But I don't think I would have. It's just that's what his plan was." Aiken admitted that he and Fitzwater had had more than one conversation in which they had discussed "homeless people" being "what's wrong with the country," but "obviously [Fitzwater] took it way farther. So it never was this truly gruesome hate crime."

¶19　Although Aiken maintained that targeting a "homeless person" was Fitzwater's idea, he admitted that he had selected the location. Aiken told police that he had grown up camping, hunting, and fishing in that area. Fitzwater had never been there, but Aiken "knew it like the back of [his] hand" and knew that there were encampments in the area. Aiken reiterated that the plan was "[t]o go out there and think about being tough with a homeless guy" because "[t]hey're not contributing to society."

¶20　Over the course of the interview, Aiken also changed his story about possessing the firearm and ammunition. When first asked about the bullets found in his pocket, Aiken claimed that Fitzwater had dropped them on the trail, and Aiken had picked them up and handed them back to Fitzwater. But when the detective asked why the bullets were in his pocket when he was arrested, Aiken replied, "Right? . . . Gosh-dang it, has he been trying to set me up from the beginning?" Aiken also initially claimed that he had not possessed the gun that night. But when asked again whether he had the gun, Aiken responded, "I just had something come back to me. No. After he shot the guy, [Fitzwater] like shoved [the gun] at me. And . . . I put it in my back [pocket] and I ran. . . . So I did have the gun after he shot the guy." Aiken also admitted that, after returning to the truck, he told Fitzwater to hide the gun. When the

detectives asked Aiken why he did not tell the officers when he was arrested that Fitzwater had shot someone, Aiken said, "part of it is because he is my buddy" and "I was taking one for the team."

¶21 After this interview, Aiken agreed to return to the crime scene with the detectives. He showed the detectives how he and Fitzwater got to the victim's campsite and where the victim was sleeping on the ground facing the tent with the firepit at his back. He pointed out the tree where he claimed to have been crouching and showed the detectives where he claimed Fitzwater was standing, between the tent and the victim, facing Aiken. He claimed that Fitzwater had fired back toward Aiken as the victim "kind of leaned up."

¶22 The next day, Aiken called his father from the jail. Aiken told his father that he "got in trouble" and that Fitzwater "killed someone and he's saying it's me, so I'm trying to get it figured out." On this call, Aiken admitted to being with Fitzwater when he shot the victim and that they "were out there . . . asking for trouble, . . . [b]ut never, ever [murder]. Never, ever." Aiken said that it was "sickening" and that he "feels so picked on" and that "it's not fair."

*Crime Scene Reconstruction*

¶23 Shortly after the victim's body was discovered, law enforcement officers and crime scene investigators arrived at the campsite to take photographs and collect evidence. The photographs showed the victim's sleeping mat, which was attached to "plywood-type" wood and propped up on 2x4s to help level it out on the uneven ground. The mat was placed between a tent on one side and a firepit on the other. On the mat was blood and a spent .45 caliber shell casing. The bullet that killed the victim was later found in the ground underneath where the mat had been. At the scene, investigators from the State Crime

Lab also took FARO scans to map out the natural landscape and layout of the campsite.[3]

¶24    Months later, Investigator Sandra Grogan was tasked with reconstructing the murder. In the evidence room at the Ogden Police Department, Investigator Grogan examined the mat on which the victim was killed. She used a trajectory rod and an angle finder to determine "the direction the bullet went into the mat." Comparing the directionality of the bullet with the crime scene photographs, Investigator Grogan was able to determine that the bullet was fired from the fireplace side of the mat, not from the tent side of the mat as Aiken had claimed. Investigator Grogan placed a 160-pound mannequin on the mat to see if it would change the trajectory but noted no significant difference.

¶25    Investigator Grogan then traveled to the crime scene with Detective Steve Zaccardi. The remnants of the victim's firepit and some stakes that had been holding up the sleeping mat were still there. Using those landmarks and the measurements and photographs of the crime scene, Investigator Grogan placed a replica of the mat in the same position as the night of the murder. A trajectory rod had been placed through the replica at the same angle that the bullet traveled through the mat. Based on the medical examiner's measurements of the bullet entry and exit wounds, Investigator Grogan placed a second trajectory rod through a mannequin head to determine the position of the victim when he was shot. Investigator Grogan confirmed that the bullet had come from the firepit side of the mat and that the victim had been looking the other way, toward the tent, when he was shot. Because the bullet did not enter any other part of the victim's

---

3. A FARO scan uses "3D laser scanning technology" and allows crime scene investigators "to capture complete, accurate views of the on-scene evidence and generate photorealistic 360-degree views of the space." FARO, https://www.faro.com/en/LP/Crime-Workflow#cta.

body, Investigator Grogan was also able to determine that the victim had lifted his head and was starting to rise when he was shot.

*Trial*

¶26    Aiken was charged with murder and stood trial separately from Fitzwater. The State argued that Aiken was either the shooter or that he aided and abetted Fitzwater's commission of the crime. The jury was instructed that Aiken could be convicted as either a principal or a party to the murder.

1.    Investigator Grogan's Testimony

¶27    At trial, the State called Investigator Grogan to testify about the two crime scene reconstructions she had performed— one at the police station and one at the crime scene—and to offer her expert opinion as to what each analysis showed. Specifically, she testified that the police station reconstruction established that the bullet was fired from the firepit side of the mat, not the tent side as Aiken had described in his statements to police. The crime scene reconstruction confirmed the placement of the shooter and also established that the victim was facing the tent and beginning to rise when the shot was fired.

¶28    Trial counsel did not object to Investigator Grogan's testimony but established on cross-examination that the "trajectory process that she used [was not] an exact science" and that all variables had not been precisely replicated.

2.    Detective Zaccardi's Testimony

¶29    Detective Zaccardi also testified about the crime scene reconstruction. He explained how he assisted Investigator Grogan and described what was depicted in photographs documenting the reconstruction. He also repeated the opinions that Investigator Grogan had offered about where the shooter was standing and

how the victim was facing the tent and beginning to rise when the shot was fired.

¶30 Detective Zaccardi offered two additional opinions that he formed based on the reconstruction. First, because the ejected shell casing was found on the mat, he opined that the shooter must have been holding the gun sideways when it was fired. Second, he opined that if Aiken had been standing by the tree as he claimed, it was doubtful that he would have been able to see the victim from that distance through the foliage at night, particularly when the shooter would have been standing between Aiken and the victim, obstructing Aiken's view. Instead, Detective Zaccardi placed the second person close to the shooter, near the tent.

¶31 Trial counsel did not object to Detective Zaccardi's testimony but elicited on cross examination that Zaccardi had no formal training in crime scene reconstruction. Detective Zaccardi also conceded that he had conducted no tests to determine how a spent casing would have ejected from the murder weapon. He further conceded that the only reason he placed the second person near the tent was because "the victim [was] looking in [that] direction which would indicate to me that he is being either spoken to or he's looking at something."

3.    The FARO Exhibits

¶32 The State offered ten computer-generated images as exhibits that purported to illustrate the difference between the scenario described by Aiken and the scenario suggested by the reconstruction. To create those reconstruction exhibits, Investigator Heather Miles started with a 3D image, or point cloud, of the landscape where the murder occurred. Investigator Miles testified that she did not create the point cloud; the campsite was scanned by the State Crime Lab using a FARO machine and those scans were stitched together by a FARO representative to create a 3D representation of the crime scene. Trial counsel did not

challenge Investigator Miles's ability to lay foundation for the FARO point cloud.

¶33    To create the reconstruction exhibits, Investigator Miles added additional details to the FARO point cloud based on crime scene photographs, such as food items and the victim's sleeping mat. She then placed human figures into the scene based on information from Detective Zaccardi's report.

¶34    The first series of reconstruction exhibits purport to depict how Aiken described the shooting to police. In those images, the victim is depicted as an orange figure lying on the mat, the shooter (Fitzwater) is standing on the tent side of the mat, and a second figure (Aiken) is standing some distance away by a tree. Detective Zaccardi testified that, "based on the physical evidence, [i]t's impossible" that Fitzwater fired the shot from that position.



¶35    The second series of reconstruction exhibits purport to depict how Detective Zaccardi believed the shooting occurred. Those images again show an orange figure lying on the mat, but now the shooter is depicted as a blue figure standing on the firepit side of the mat and a second blue figure is shown standing between the tent and the shooter. Detective Zaccardi initially testified that both blue figures were placed "in a

location that would fit all the physical evidence." On cross-examination, however, he clarified that while the placement of the shooter was based on the trajectory evidence, the placement of the second figure was "based on speculation and conjecture" and there was "no solid physical evidence that person was standing there."



4.      Testimony of the Victim's Mother

¶36    The State also called the victim's mother to testify at trial. During her testimony, the mother told the jury about her son's upbringing and other life circumstances. She explained that he had been married "for about a year to an older lady" and that "they ended up having two beautiful little baby girls." The mother believed that the victim's ex-wife was not a good influence on him and "got him into drugs," which resulted in a divorce and the children being adopted. She explained that after the divorce and adoption, the victim "was kind of lost" and "was homeless [for] the moment." He eventually made his way from California to Utah. The mother shared three pictures of the victim: one of him "holding his little baby brother," another of him with his brothers and an uncle, and one of him and his mother that was taken a week before he left for Utah.

¶37    Trial counsel did not object to the mother's testimony and did not engage in cross-examination.

5.    Aiken's Testimony

¶38    Aiken took the stand in his defense. Aiken testified that the reason he and Fitzwater went to the wooded area was to smoke marijuana and talk about Fitzwater's marital issues. Aiken claimed that they had not gone "to the pond area to kill the homeless" or "to fight the homeless," and that he had had "no idea" that Fitzwater "was going to kill a homeless person" that night. He insisted that he and Fitzwater had never "talk[ed] about beating up or killing the homeless." When asked why he told police otherwise, Aiken responded:

> Because I had been without sleep for over 24 hours and I was in, being interrogated for 5 hours. And he asked me the same question over, I don't even know how many times, 50 times. And I didn't think their questions would stop unless I said what they wanted me to say.

But Aiken admitted that it was his decision to go to the 21st Street pond area and that he assumed there would be "transients" there because he had seen them there in the past. Aiken also admitted that he had first driven Fitzwater back home to grab a "few beers, a gun, and the bag of weed," and that he knew Fitzwater was carrying the gun when they left the truck and headed east toward the victim's camp.

¶39    Aiken testified that Fitzwater had unexpectedly turned off the main trail and had led the way through the trees to the victim's camp, holding the gun against his chest. Aiken claimed that he had stayed back by a tree about twenty yards away, but that Fitzwater had "just walked into the middle of the camp and was looking around at things" with the gun "still against his chest." He testified that Fitzwater "would have been close to the fire pit,"

"closer to the mat than what [Aiken] initially had indicated to the detectives." Aiken claimed that when the victim woke up and "started getting up from his sleeping position, a cat ran out from underneath of him," and Aiken's eyes followed the cat. Then "the shot rang out" and the victim "fell down and quit moving."

¶40     Aiken claimed that he "took off running" but was not sure where he was going because "[t]here was no clear exit" and "[i]t was really thick back there." Aiken and Fitzwater "met up and [Fitzwater] shoved the gun at [Aiken]" who "took it and . . . ran back to the truck." He explained that "at first [he] actually didn't even remember" that Fitzwater had given him the gun but that it "came back to [him] a little bit later because the state of shock [he] was in."

¶41     Aiken also changed his story about how the bullets had gotten into his pocket. Aiken reiterated that Fitzwater had dropped at least one bullet on the trail, but this time Aiken claimed that Fitzwater had picked it up himself. Aiken testified that, after the shooting, he had returned to the truck with the gun, unloaded it, and put the bullets into his pocket at that time. When asked why he had not told the police how the bullets got into his pocket, Aiken explained, "Well, the state of shock I was in I couldn't remember at all what had happened until a week and a half, two weeks later."

¶42     Aiken also offered a new explanation for his actions following the shooting. He testified that he kept quiet, not because Fitzwater was his "buddy" and he "wanted to take one for the team," but because he was afraid of Fitzwater and feared that he would do something to Aiken or his family. But on cross-examination, Aiken acknowledged that he had waited for about twenty-five minutes for Fitzwater to return to the truck, even though Aiken had Fitzwater's gun and could have driven away or called the police or an ambulance. And he admitted that he was the one who instructed Fitzwater to hide the gun. When asked

why he did not tell the police about the shooting when they were stopped, Aiken claimed, "I was still scared of [Fitzwater] at that time. He was giving me death looks. And I was scared of the whole situation. And I was even scared of the cops."

¶43    Aiken also admitted that, during the traffic stop, he was "joking around with the officer [and] acting like [he didn't] know where the gun" was, even though he knew it had just been used to shoot someone. Aiken explained that he was "smiling, joking around," and "hoping the officer just would not find the gun" because he "just wanted it all to go away."

¶44    Aiken also admitted that he had lied to the police when he said that he and Fitzwater were just walking near the pond and had not "come face to face with any homeless people." And he acknowledged that he deliberately tried to mislead the officers by saying that he and Fitzwater had walked west rather than east. He also admitted that he told the police that he had heard a gunshot from far off and asked if someone had been killed, even though he had been present and knew exactly what had happened. Because he did not know that the police had found the body, he admitted that he told the police that the gunshot had come from a different direction, hoping that they would not find the victim. He also admitted lying to the police when he claimed that he and Fitzwater had not taken the gun with them when they left the truck.

¶45    Aiken acknowledged that his story had changed when the police told him that the casing found at the victim's campsite matched the gun. He told the police that he was going to "come clean" but then lied again and said that he and Fitzwater had been separated when he heard the gunshot. When Aiken realized that the police did not believe his story, he changed it again and admitted that he was present when the victim was shot.

¶46    The jury convicted Aiken of murder.

ISSUES AND STANDARDS OF REVIEW

¶47    Aiken raises two ineffective assistance of counsel claims on appeal. He argues that counsel was ineffective in failing to object to (1) the crime scene reconstruction evidence and (2) the victim's mother's testimony. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up), *cert. denied*, 525 P.3d 1254 (Utah 2022).[4]

¶48    Aiken also seeks a remand under rule 23B of the Utah Rules of Appellate Procedure based on two claims of ineffective assistance of counsel. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in

---

4. Aiken also argues that we should reverse the conviction under the cumulative error doctrine. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Ramos*, 2018 UT App 161, ¶ 22, 428 P.3d 334 (cleaned up), *cert. denied*, 437 P.3d 1249 (Utah 2019). Because we conclude that Aiken has not established either ineffective assistance claim, the cumulative error doctrine does not apply. Further, Aiken seeks a remand under rule 23B to support his argument that counsel should have objected to certain crime scene reconstruction testimony and evidence and offers an affidavit from an expert witness in support of his 23B motion. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). But for the same reasons discussed in Part I, Aiken was not prejudiced by the admission of the allegedly improper evidence. Accordingly, we deny the request for remand.

the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Crespo*, 2017 UT App 219, ¶ 24, 409 P.3d 99 (cleaned up), *cert. denied*, 417 P.3d 575 (Utah 2018).


ANALYSIS

### I. Aiken Was Not Prejudiced by the Admission of the Crime Scene Reconstruction Evidence.

¶49 Aiken argues that he received ineffective assistance of counsel at trial when his attorney failed to object to the admission of crime scene reconstruction evidence on three occasions. First, he argues that trial counsel should have objected when the State failed to lay an adequate foundation for the admission of the FARO images used to create the reconstruction exhibits. Second, he argues that trial counsel should have challenged the reliability of Investigator Grogan's and Detective Zaccardi's reconstruction at the crime scene.[5] Third, he argues that trial counsel should have objected to Detective Zaccardi's opinion testimony because he was not a qualified expert.

¶50 To prevail on a claim of ineffective assistance of counsel, Aiken "must demonstrate that (1) his counsel's performance was deficient in that it 'fell below an objective standard of reasonableness' and (2) 'the deficient performance prejudiced the defense.'" *State v. Scott*, 2020 UT 13,

---

5. Aiken also seeks a remand under rule 23B of the Utah Rules of Appellate Procedure to admit evidence from a reconstruction expert that he claims would have proven that the State's crime scene reconstruction was unreliable and should have been excluded. Because we conclude that Aiken cannot demonstrate a reasonable probability of a different result even if he had successfully challenged the crime scene reconstruction evidence, we deny the rule 23B motion on that claim.

¶ 28, 462 P.3d 350 (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [a defendant's] claims under either prong." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," we will do so. *Strickland*, 466 U.S. at 697.

¶51　To evaluate whether a defendant has established prejudice under *Strickland*, "we assess counterfactual[] scenarios—that is, what would have happened but for the ineffective assistance." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. In other words, we must "consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." *State v. Leech*, 2020 UT App 116, ¶ 67, 473 P.3d 218, *cert. denied*, 481 P.3d 1039 (Utah 2021).

¶52　Before we can conduct this counterfactual analysis, we must identify exactly what the jury would have heard if the evidence Aiken challenges on appeal had been excluded. Even if Aiken had successfully challenged Detective Zaccardi's opinions as improper expert testimony and Investigator Grogan's reconstruction at the crime scene as unreliable, Investigator Grogan still would have testified about the trajectory analysis conducted at the police station. Based on that analysis, Investigator Grogan concluded that the shooter was standing on the firepit side of the mat when the shot was fired, not on the tent side as Aiken had told police. Aiken has not challenged that analysis as unreliable. Moreover, Aiken admitted in his own testimony that his earlier placement of the shooter may have been inaccurate and that the shooter was "close to the firepit." In short, the jury would have heard testimony placing the shooter on the firepit side of the mat, which Aiken never directly challenged.

¶53 The reconstruction at the crime scene, which Aiken has challenged, led to four additional conclusions. Both Investigator Grogan and Detective Zaccardi opined that the victim was (1) beginning to rise and (2) facing the tent when the shot was fired. Detective Zaccardi also opined that (3) the shooter must have been holding the gun sideways in order for the spent shell casing to land on the mat, and (4) the second person was likely standing next to the shooter near the tent.

¶54 As to the first two opinions, Aiken has not explained how the position of the victim implicated him as a party to murder. Aiken himself told the officers that the victim was in the process of sitting up when the shot was fired, and he confirmed that fact in his testimony at trial. *See supra* ¶¶ 21, 39. And Aiken did not dispute that the victim was facing the tent and never told the officers otherwise. As to the third opinion, Aiken has not explained how the manner in which the shooter held the gun made it more or less likely that Aiken was guilty of murder.

¶55 Only the fourth opinion—and the related reconstruction exhibits—had any conceivable potential for prejudice. Detective Zaccardi testified that he believed that the second person was standing between the tent and the victim, not by the tree as Aiken claimed. Aiken argues that Detective Zaccardi was "wrapped in the guise of expert qualifications" when he "discredited [Aiken's] view of the case and placed [Aiken] in a position where he was either the shooter or aided and abetted the shooter."

¶56 The second series of FARO reconstruction exhibits aligned with Detective Zaccardi's testimony and report, placing the second person in the same position. Aiken claims that trial counsel should have objected to the FARO images based on lack of foundation because Investigator Miles did not personally create the point cloud. But the point cloud showing the landscape of the crime scene was not itself inculpatory. Nor was there a dispute

about the physical layout of the campsite. The prejudice Aiken asserts is not from the point cloud but from the reconstruction exhibits Investigator Miles personally created by overlaying the 3D image of the campsite with figures in the positions described by Detective Zaccardi's report. Aiken characterizes those exhibits as "persuasive digital depictions of the crime scene" that gave the State a "powerful[]" argument that Aiken "was either the shooter or he aided and abetted in the shooting." But, for the reasons explained below, there is no reasonable probability that the placement of the figures—either during Detective Zaccardi's testimony or in the reconstruction exhibits—affected the jury's verdict.

¶57    Aiken was charged as either a principal or party to the offense of murder. To prove his guilt as a party to the offense, the State was not required to prove that he personally shot the victim. Instead, the State was required to prove only that (1) the offense had been committed; (2) Aiken had intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided the commission of the offense; and (3) Aiken acted with the mental state required for murder. *See* Utah Code § 76-2-202.

¶58    As to the first element, Aiken does not dispute that someone committed the offense of murder. In fact, Aiken testified that he saw Fitzwater intentionally shoot the victim in the head. To establish the second and third elements of party liability, it was enough to prove that Aiken intentionally aided the commission of the offense with intent to cause the victim's death or knowing the victim's death was reasonably certain to result.[6]

---

6. At trial, the State did not put on evidence that Aiken "solicited, requested, commanded, [or] encouraged" Fitzwater to commit the murder. In closing, the State argued that Aiken intentionally aided Fitzwater's commission of the offense.

¶59   The second and third elements of party liability were established through evidence that had nothing to do with the position of the victim or the location of the two men at the time of the shooting. Therefore, there is no reasonable likelihood that Aiken would have been acquitted if the jury had not been presented with the evidence that Aiken believes should have been excluded.

¶60   Aiken's own statements were offered to prove both that he intentionally aided Fitzwater by guiding him to the victim's camp and that he did so knowing the victim's death was reasonably certain to result. Aiken admitted in his interviews that he and Fitzwater were targeting "homeless people" that night. Aiken told police that he heard Fitzwater talk about his hatred of "homeless people" "constantly" and that he had said "some violent things, kind of like he wanted to kill them." With this foreknowledge of Fitzwater's intentions, Aiken intentionally aided the commission of the murder by taking Fitzwater home to get his gun, driving Fitzwater to a location Aiken knew was frequented by "homeless people," and guiding Fitzwater through the dark, unfamiliar territory that Aiken knew like the "back of [his] hand."

¶61   Aiken's own statements also supported the jury's finding that he acted with the intent to cause the victim's death or knowing the victim's death was reasonably certain to result. Intent is rarely subject to direct proof and must generally be inferred from the actions of the defendant and the surrounding circumstances. *See State v. Florez*, 2020 UT App 76, ¶ 18, 465 P.3d 307. In this case, the State offered Aiken's own admission that he went to the 21st Street pond with Fitzwater to "pick a fight with homeless people" and "beat them up." Aiken also knew that Fitzwater was carrying a loaded gun in a ready position against his chest as they approached the victim's campsite, looking for a "homeless person" "to hurt." And Aiken admitted to police that he thought Fitzwater went there "to kill somebody." At the very least, this evidence established that Aiken knowingly caused the

victim's death because he was aware that his conduct—guiding an armed Fitzwater to an unsuspecting victim—was reasonably certain to cause that result. *See* Utah Code § 76-2-103(2).

¶62    At trial, Aiken denied that he and Fitzwater had ever discussed "beating up or killing a homeless person" and claimed that he did not know that Fitzwater intended to shoot someone that night. But, in finding Aiken guilty, the jury necessarily concluded that this testimony was not credible. Importantly, whether Aiken's testimony on that point was credible had nothing to do with the evidence that he asserts should not have been admitted. Where the second person was standing when the shooting occurred did not make it any more or less likely that Aiken knew the victim's death was reasonably certain to result when he helped Fitzwater locate the victim.

¶63    Aiken's actions after the murder were also consistent with him having intentionally aided the commission of the offense with the mental state required for murder. After the shooting, Aiken took the gun from Fitzwater, ran back to his truck, unloaded the gun, and put the bullets into his pocket. He waited there for twenty-five minutes until Fitzwater found his own way back to the truck. During that time, Aiken did not call the police or attempt to summon help for the victim. Then, when stopped by police a few minutes later, Aiken told Fitzwater to hide the gun and initially denied the existence of the gun when questioned by police. During the traffic stop, Aiken joked with the officer and never mentioned that a man had been shot and might need help. A jury could reasonably conclude that Aiken behaved in this manner because he had been a party to the murder, not an innocent bystander who had been surprised by Fitzwater's actions. To be sure, Aiken gave another explanation at trial—that he was afraid of Fitzwater and believed he would hurt Aiken or his family. But, again, the jury's assessment of whether to credit this explanation had nothing to do with whether Aiken was standing by the tree or next to Fitzwater when the shot was fired.

¶64 The only thing that the crime scene reconstruction purported to establish was that Aiken and Fitzwater were not standing in the places Aiken described to police, first in his interviews and later at the crime scene. But Aiken himself admitted as much when he took the stand at trial. Aiken admitted that he may have been mistaken in his placement of the shooter, whom Aiken claimed was Fitzwater, but maintained that he was crouching by a tree twenty yards away, not standing next to Fitzwater as Detective Zaccardi surmised. But whether Aiken was close to Fitzwater or twenty yards away when the shot was fired was irrelevant to the question before the jury—whether Aiken intentionally aided Fitzwater to commit the murder knowing that the victim's death was reasonably certain to result. Although Detective Zaccardi speculated that the victim might have been looking toward Aiken when he was shot, the State never suggested that Aiken's position distracted the victim or otherwise aided Fitzwater's commission of the offense. And the State never argued that Aiken's position had any bearing on whether he had the requisite mental state for murder. Because his guilt as a party to the murder did not depend on where he was standing, there is no reasonable likelihood that the admission of the challenged evidence changed the result.

¶65 The only suggestion that the placement of the second person was relevant to Aiken's culpability was elicited by trial counsel on cross-examination when Detective Zaccardi agreed that placing the two individuals in those positions made it "more likely" that "they were both involved." But Aiken admitted he was involved—he testified that he drove Fitzwater to the area, accompanied him to the camp, witnessed the shooting, took the murder weapon back to his truck, waited for Fitzwater to return, told Fitzwater to hide the gun, and protected his friend when stopped by police. The question before the jury was not whether he was "involved," but whether he intentionally aided the commission of the offense with intent to cause the victim's death or knowing the victim's death was reasonably certain to result.

Whether Aiken was standing next to the tree or next to Fitzwater when the shot was fired had no bearing on that question.

¶66 At most, the opinion that Aiken was not by the tree, as he claimed, undermined his credibility. But Aiken admitted that he had lied to the police and had changed his story multiple times. The trajectory analysis conducted at the police station—evidence Aiken has not challenged—showed that Aiken had not told the police the truth about the shooter's location. Any additional impeachment value from Detective Zaccardi's opinion did not materially change the overall evidentiary picture, particularly where trial counsel effectively undercut the placement of the second figure on cross-examination. Specifically, trial counsel elicited testimony from Investigator Miles that the placement of the second figure was based solely on Detective Zaccardi's report and then elicited testimony from Detective Zaccardi that the placement was based on speculation and conjecture and not on any physical evidence. Given Aiken's admission that he had repeatedly lied about what had occurred during the shooting, there is no reasonable probability that the placement of the second figure—which lacked any significant probative value and was admittedly speculative—affected the jury's verdict.

¶67 Even if the crime scene reconstruction evidence that Aiken challenges on appeal had been excluded, there is no reasonable probability that Aiken "would have obtained a more favorable outcome at trial." *State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261 (cleaned up), *cert. denied*, 432 P.3d 1225 (Utah 2018). The position of the victim and the location of the two men at the time of the shooting were irrelevant to whether Aiken intentionally aided the commission of the offense with intent to cause the victim's death or knowing the victim's death was reasonably certain to result. Whether Aiken was standing by the tree or next to Fitzwater when the shot was fired had no impact on the State's proof that Aiken was guilty as a party to the murder. Therefore, we conclude that Aiken's ineffective assistance of

counsel claims relating to the crime scene reconstruction fail for lack of prejudice.

## II. Counsel Did Not Perform Deficiently by Not Objecting to the Victim's Mother's Testimony.

¶68 Aiken next argues that trial counsel performed deficiently in failing to object to the victim's mother's testimony that included "inadmissible victim impact evidence." To show deficient performance, Aiken argues that trial counsel acted unreasonably in not objecting to the mother's testimony because he was "responsible for knowing the law, and thus should have known the confines of victim impact evidence and of the relevance rules."

¶69 Even accepting Aiken's argument that much of the mother's testimony was inadmissible, we conclude that trial counsel's decision to forgo an objection did not fall below an objective standard of reasonableness. "Judicial scrutiny of counsel's performance is highly deferential," and we indulge "a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Escobar-Florez*, 2019 UT App 135, ¶ 27, 450 P.3d 98 (cleaned up), *cert. denied*, 458 P.3d 748 (Utah 2020). "[N]ot objecting to an error does not automatically render counsel's performance deficient." *State v. Ray*, 2020 UT 12, ¶ 31, 469 P.3d 871. Further, "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. Instead, "[t]he reasonableness of counsel's challenged conduct must be judged on the facts of the particular case, viewed as of the time of counsel's conduct." *Ray*, 2020 UT 12, ¶ 31 (cleaned up); *see also id.* ("The United States Supreme Court has rejected the notion that certain actions by counsel are *per se* deficient as inconsistent with *Strickland*'s holding that 'the performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances.'" (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000)).

¶70    Based on all the circumstances at trial, we conclude that trial counsel's decision to forgo an objection to the mother's testimony was not objectively unreasonable. *See id.* Because Aiken told police that the killing was motivated by hatred of "homeless people," trial counsel could have reasonably concluded that the mother's testimony was relevant to establish that the victim belonged to the targeted group.

¶71    Once the mother was on the stand, trial counsel could have reasonably refrained from objecting to extraneous details, especially where that testimony was brief and not inflammatory. We agree with the State that choosing such a strategy was objectively reasonable to "avoid alienating the jury by appearing unsympathetic or callous toward" the victim or his mother.

¶72    It was also consistent with the defense strategy. Aiken himself characterized the murder as a "truly gruesome hate crime" and trial counsel stated in closing that Aiken "wholeheartedly agree[d] with the State" that the victim's death was "horrific" but that he was not responsible for the murder. Not objecting to the State's attempt to humanize the victim arguably allowed Aiken to show empathy toward the victim and his family without undermining Aiken's theory of the case.

¶73    Aiken has not shown that objecting to the extraneous details in the mother's testimony was "a battle that competent counsel would have fought." *Ray*, 2020 UT 12, ¶ 32. Because he has not demonstrated that trial counsel's performance was objectively deficient, Aiken cannot establish his claim of ineffective assistance relating to the mother's testimony.

### III. Aiken Has Not Shown that a Remand Is Warranted Under Rule 23B.

¶74　In his rule 23B motion, Aiken raises two additional claims of ineffective assistance of counsel for which he seeks a remand to supplement the record with facts necessary to support each claim. First, Aiken argues that trial counsel was ineffective in failing to request a unanimity instruction. Second, Aiken argues that counsel was ineffective in failing to present expert testimony on false confessions.

¶75　When seeking a remand under rule 23B, the motion "must meet several requirements: (1) it must be supported by affidavits alleging facts outside the existing record, (2) the alleged facts must be nonspeculative, and (3) the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim, i.e., counsel's deficient performance and resulting prejudice." *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926.

¶76　To support his request for a remand with regard to the unanimity instruction, Aiken submitted an affidavit from his trial counsel stating that not requesting the instruction was "an oversight and not part of trial strategy." The State argues that this is not a proper basis for a rule 23B remand because "[t]he record is clear that counsel did not ask for the instruction" and therefore the claim is not one "that requires additional factual development." We agree.

¶77　"Rule 23B is directed to cases where some crucial factual information is *absent* from the record, not the typical ineffective assistance case where the parties dispute whether trial counsel's actions reflected some strategy [or was otherwise reasonable], given the facts established by the record." *State v. Curtis*, 2013 UT App 287, ¶ 27, 317 P.3d 968 (cleaned up), *cert. denied*, 343 P.3d 708 (Utah 2015). To prove deficient performance, Aiken must show that his counsel's actions were *objectively* unreasonable. *See State v. Gallegos*, 2020 UT 19, ¶ 47, 463 P.3d 641 ("The *Strickland* inquiry

is objective, not subjective."). Trial counsel's subjective reason for not requesting a unanimity instruction is not directly relevant to the analysis. Because trial counsel's affidavit does not allege a fact outside the existing record that, if true, would establish an ineffective assistance of counsel claim, Aiken has not made the required rule 23B showing. Accordingly, we deny Aiken's request for a remand to supplement the record on this basis.[7]

¶78 Aiken also argues that trial counsel "was deficient when he did not investigate whether a false confession expert could have explained to the jury the limits of [Aiken's] confessions to the police." In support of his request for remand, he offered an affidavit from an expert on false confessions who opines that a police interrogation technique, known as the Reid Technique, is "[a] common contributor to false confessions" and that the technique was used in Aiken's interview. If he had been retained in this case, the expert would have been available to testify "about the surprising frequency of false confessions; their correlation with sleep deprivation; their correlation with use of the Reid Technique; and the use of the Reid technique in this case."

¶79 Whether this case even involves an allegedly false confession is debatable. Aiken never confessed to murder, either as a principal or as a party. His admissions about Fitzwater's statements and Aiken's own understanding of "the plan" were offered as circumstantial evidence to prove that he had the mental

---

7. In Aiken's reply to the State's opposition to his rule 23B motion, Aiken suggests that, if "the State concedes the record is adequate for this Court's review," we should "review the issue on its merits." We decline that invitation because the issue was not raised in Aiken's principal brief, and reaching the issue would deny the State an adequate opportunity to respond. *See, e.g.,* *Mackin v. State,* 2016 UT 47, ¶ 34 n.8, 387 P.3d 986 ("In the interests of fairness, we do not address arguments omitted from an appellant's opening brief.").

state required for murder, despite his denials. Because this is not a case in which the defendant ever admitted guilt, trial counsel could have reasonably concluded that expert testimony on false confessions had limited applicability.

¶80    In any event, Aiken cannot establish prejudice. To establish prejudice, it is not enough for a defendant to "show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). Instead, the defendant has "the burden of showing that the decision reached would reasonably likely have been different absent [trial counsel's alleged] errors." *Gallegos*, 2020 UT 19, ¶ 33 (cleaned up). Even assuming that trial counsel had elicited the testimony set forth in the expert's affidavit, Aiken has not demonstrated a reasonable probability that the result of the trial would have been different.

¶81    Even without expert testimony, the jury had the opportunity to consider the defense's "false confession" theory, which trial counsel developed through Aiken's own testimony. Aiken maintained that he had told the police the truth about what happened during the shooting but that his statements about his state of mind were false. Aiken also offered an explanation as to why he would have admitted a motive that was not true. When asked why he told the police that he and Fitzwater had "talk[ed] about beating up or killing the homeless," he testified as follows:

> Because I had been without sleep for over 24 hours and I was in, being interrogated for 5 hours. And he asked me the same question over, I don't even know how many times, 50 times. And I didn't think their questions would stop unless I said what they wanted me to say.

Under these circumstances, "[t]he jury was well positioned to consider [Aiken's] explanation for [his] shifting story and to conclude which of [his] versions of events they believed" without expert testimony. *See State v. Prater*, 2017 UT 13, ¶ 41 n.5, 392 P.3d

398. The expert's testimony "would have done little to explain—beyond what the jury already knew—why he purportedly falsely confessed." *See State v. Streeper*, 2022 UT App 147, ¶ 38, 523 P.3d 710 (holding that failure to call an expert was not prejudicial, in part because the false confession theory was developed through the defendant's own testimony).

¶82    To be sure, expert testimony could have lent credence to Aiken's claim that the circumstances surrounding his interviews might produce a false statement. But, under the facts of this case, Aiken cannot establish a reasonable probability that the absence of expert testimony affected the jury's verdict. Aiken had to convince the jury that, when repeatedly pressed by police about his role in the shooting, he successfully resisted the urge to falsely admit guilt, but that he nonetheless fabricated his statements about all the "talk" of "homeless people." The expert's affidavit offers no explanation for why a person in Aiken's position would have falsely admitted to participating in those conversations while steadfastly minimizing his culpability for the murder. Without such an explanation, it is unlikely that the jury would have believed that Aiken selectively succumbed to police pressure to say "what they wanted [him] to say," but only with respect to his conversations with Fitzwater.

¶83    The jury was more likely to believe that Aiken's statements to police were true because they squared with the other evidence at trial. In a recorded jail phone call, Aiken admitted to his father that he and Fitzwater "were out there . . . asking for trouble, . . . [b]ut never, ever [murder]." This admission corroborated Aiken's repeated statements to police that "[t]here was never a plan to murder, but there was a plan to hurt"—to "go and find some and beat them up"—and that Fitzwater "took it way farther."

¶84    And that was the only plausible reason for driving to the 21st Street pond in the middle of the night. Aiken testified at trial that they had gone to the pond to smoke marijuana and talk about

Fitzwater's marital issues. But he admitted that they did not take the marijuana with them when they left the truck. And his claim that he took Fitzwater there to talk because "it was a beautiful place" was difficult to reconcile with his admission that it was too dark to see where they were going. The only coherent explanation for visiting the pond at 3:00 a.m. was the one that Aiken gave to the police: they were looking for "a homeless guy" to hurt, and Aiken knew that "homeless people" camped at the pond.

¶85    In sum, there is no reasonable probability that the jury would have reached a different verdict if trial counsel had engaged an expert to support Aiken's "false confession" theory. Aiken's "own testimony put before the jury not only the assertion that his confessions were false but the putative reason for his false confessions." *See Streeper*, 2022 UT App 147, ¶ 37. And Aiken's statements to police explaining why he and Fitzwater went to the pond were consistent with the other evidence before the jury. The facts alleged in the expert's affidavit would not have significantly altered this evidentiary landscape, especially since the expert has offered no explanation for why Aiken would selectively "confess" to conversations with Fitzwater while otherwise maintaining his innocence. Because Aiken cannot "meet the test for ineffective assistance of counsel, even if [the] new factual allegations were true, there is no reason to remand the case." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166.

CONCLUSION

¶86    Aiken has failed to establish his ineffective assistance claims on appeal. He has not demonstrated a reasonable probability of a different result if his trial counsel had successfully challenged certain crime scene reconstruction evidence at trial. And he has not shown that objecting to the testimony of the victim's mother was a battle that competent trial counsel would have fought. Finally, Aiken has not established that a remand is required under rule 23B because his claim that counsel performed

deficiently in failing to request a unanimity instruction does not depend on facts absent from the record, and he has not established a reasonable probability that the jury's verdict would have been different if trial counsel had called an expert witness on false confessions. Therefore, we affirm.

———