**2026 UT App 10**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CORY MICHAEL FITZWATER,
Appellant.

Opinion
No. 20220451-CA
Filed January 29, 2026

Second District Court, Ogden Department
The Honorable Camille L. Neider
No. 181902031

Ann M. Taliaferro, Staci Visser, and Jackie
Reidelberger, Attorneys for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

TENNEY, Judge:

¶1      After spending several hours drinking, Cory Fitzwater and Dalton Aiken drove to a pond near Ogden in the middle of the night. The two walked into a secluded and forested area near the pond, where they found the camp of a sleeping homeless man. At that point, either Fitzwater or Aiken took out a handgun and shot the man, killing him. Officers quickly obtained evidence that pointed to Fitzwater and Aiken as the likely culprits. In a series of police interviews that occurred over the ensuing days and weeks, Fitzwater and Aiken each gave conflicting stories, and each ultimately blamed the other for the shooting.

¶2    Fitzwater and Aiken were each charged with several offenses, including murder, and they were jailed pending trial. The State later filed witness tampering charges against Fitzwater based on Fitzwater's attempts to bribe two fellow inmates into giving false testimony implicating Aiken. Aiken's case was severed from Fitzwater's. Aiken went to trial first, and he was convicted of murder. At Fitzwater's subsequent trial, Fitzwater was prosecuted for murder under alternative theories of principal and accomplice liability. At the close of trial, the jury found Fitzwater guilty on all charges.

¶3    Fitzwater now appeals his convictions on several grounds. These include: (1) a series of arguments relating to the unanimity instructions; (2) a claim that he received ineffective assistance because his defense counsel (Counsel[1]) stipulated to the admission of Aiken's conviction and various statements Aiken made to police; and (3) a claim that he received ineffective assistance because Counsel did not move to sever the witness tampering charge from the other charges in his case. For the reasons set forth below, we see no reversible error and affirm Fitzwater's convictions.


BACKGROUND[2]

*The Murder and Initial Encounter with Police*

¶4    On the evening of August 15, 2018, Aiken went to the home of Fitzwater (who was his friend) and offered to give Fitzwater

---

1. Fitzwater was represented by two attorneys during proceedings below. For simplicity, we'll refer to them with the singular "Counsel" throughout this opinion.

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence

(continued…)

two rifles in exchange for Fitzwater's Sig Sauer handgun. The two men spent the next several hours drinking, and around 2:00 a.m. the next morning, Aiken suggested that they go on an "adventure" to a nearby pond. The area surrounding the pond was heavily forested, and it was also frequented by homeless people. Fitzwater and Aiken were familiar with the area, and the two brought the Sig Sauer handgun with them. They drove to the pond in Aiken's truck and then smoked marijuana in the parking lot before heading out on foot onto the trails surrounding the pond.

¶5    After walking around the pond for about a half hour, Aiken and Fitzwater saw a campfire about 200 feet from the main trail (which was paved). The two men veered off the trail and walked toward the fire. There was no marked path to the area, and the two had to walk through "pretty thick" brush to get there. The two arrived at a campsite, where they found a homeless man (the Victim) sleeping on a dark mat. Fitzwater nudged the man with his foot. At that point, either Fitzwater or Aiken pulled out the Sig Sauer and shot the Victim, killing him. Fitzwater and Aiken then ran back to Aiken's truck, and while doing so, they got separated in the brush.

¶6    While Aiken and Fitzwater had been off walking around the pond and then encountering (and shooting) the Victim, a police officer happened to drive by the parked truck. When the officer got out of his vehicle and looked inside the truck's windows, he saw a bag of marijuana and a magazine for a handgun. He then parked a short distance away from the truck and waited for the owner to return. The officer also alerted two other officers, who soon arrived to assist him with what they

---

only as necessary to understand issues raised on appeal." *State v. Suhail*, 2023 UT App 15, n.1, 525 P.3d 550 (quotation simplified).

believed would be a forthcoming encounter based on the marijuana in the truck.

¶7     When Fitzwater made it back to the truck, Aiken was waiting for him. One of the two men placed the Sig Sauer behind the passenger seat. Aiken got in the driver's seat, and Fitzwater got in the passenger seat. As the two began driving away, they were pulled over by the officers. After the truck was pulled over, Fitzwater immediately put his hands up. An officer asked Fitzwater to step outside, and Fitzwater kept his hands either above his head or on the truck for the remainder of the interaction with the officers. After being told to "hang tight" by an officer, Fitzwater went into a prone position on the truck with his hands stretched outward as if he was expecting to be searched, and after he was later told to "relax," he put his hands behind his back as if he was expecting to be handcuffed.

¶8     When officers searched the truck, they found marijuana inside. They also found the Sig Sauer behind the passenger seat, a loaded magazine for the Sig Sauer and one additional round for it on the front passenger seat, two empty rifle cases behind the passenger seat, a magazine for another handgun (a Glock) in the front console, and a black ski mask with debris on it lying on the floorboard in front of the passenger seat. When officers searched Aiken, they found three bullets that matched a Sig Sauer in his pockets.

¶9     While talking with an officer at the scene, Fitzwater claimed that he and Aiken had just been "walking around" and "looking around" and that they had "stayed on the main trail." Fitzwater also said that they had only seen "like one bad person" while out. Fitzwater said nothing about having observed or been part of any shooting. At this point, the officers were unaware of the shooting. Aiken was arrested at the scene for marijuana possession, and Fitzwater was allowed to leave.

*The Early Investigation and Interviews*

¶10 Another homeless man found the Victim's body around 4:00 a.m. that morning and then alerted authorities. When police responded to the scene, they found the Victim's body lying next to a mat near a campfire. Blood was pooled on the mat near the Victim's head. Officers also found a shell casing on the mat, as well as a bullet under the mat.

¶11 At this point, Aiken was still in custody for the marijuana arrest. Officers almost immediately suspected that Aiken and Fitzwater were involved in the shooting, given that they had been pulled over in the same area in the middle of the night and officers had found a handgun and ammunition in the truck. Officers also quickly observed that the shell casing found at the scene appeared to come from a gun of the same caliber as the Sig Sauer found in Aiken's truck, and officers later matched the bullet found at the scene to that particular gun.

¶12 Aiken was interviewed by detectives several times that day, and his version of the events changed several times. In the first interview, which occurred about ten hours after his marijuana arrest, Aiken initially told detectives that he had "heard a gunshot" somewhere in the area, but he denied going into the Victim's camp, saying he never came "face-to-face" with any homeless person that night. He also said that the Sig Sauer was Fitzwater's, that they had not completed the gun trade yet, and that they had not brought the gun with them on their walk. When detectives told Aiken that they had found a shell casing at the murder scene that matched the Sig Sauer, however, Aiken changed his story. He then said that while he and Fitzwater were out walking on the main trail, Fitzwater had branched off on his own and that Aiken soon heard a gunshot off in the distance. Sometime later in this same interview, however, Aiken changed his story yet again. This time, he said that he had actually followed Fitzwater to the campsite and that he had seen Fitzwater shoot the

Victim. Aiken's initial interview ended after around thirty minutes, and he was interviewed a second time a few hours later. During this second interview, Aiken repeated his story that Fitzwater went off the trail, stumbled upon the Victim's tent, and "shot the guy."

¶13    In another interview that occurred later that day, Aiken changed his story again. This time, Aiken told detectives that he and Fitzwater had gone to the pond that night with a specific plan to "beat . . . up" or "hurt" a homeless person. He also said that they had brought the Sig Sauer with them and that he had seen Fitzwater shoot the Victim.

¶14    Fitzwater was brought in for questioning later that same day. Though a touch unclear from the record, it appears that this interview happened in between Aiken's first and second interviews. In his interview, Fitzwater said that he and Aiken had stayed on the main trails, that they hadn't heard any gunshots, and that they hadn't gone into any homeless camps. Fitzwater claimed that at some point, he had "lost" Aiken, at which point he got panicked, ran back to the truck, and found Aiken there waiting for him. Fitzwater admitted that the Sig Sauer belonged to him, but he said that he had given Aiken the gun earlier that night. Fitzwater claimed that he wasn't aware that Aiken had brought it with him on the walk. At the conclusion of this interview, Fitzwater was arrested.

¶15    Officers searched Fitzwater's house the next day. During that search, they found the case for the Sig Sauer in Fitzwater's basement, and they found several other guns too.

*Initial Charges and Fitzwater's Second Interview*

¶16    On August 23, 2018, Fitzwater was charged with one count of murder and one count of purchase, transfer, possession, or use of a firearm by a restricted person (the firearm possession charge).

Aiken was also charged with murder, and Aiken and Fitzwater were charged as co-defendants.

¶17    About four months later, Fitzwater was interviewed again, and this time he had an attorney with him during the interview. In contrast to what he had told detectives previously, Fitzwater now said that he and Aiken had walked to the Victim's camp that night, where they found the Victim sleeping. Fitzwater said that he had nudged the Victim with his foot to ask him a question. Fitzwater said that Aiken had been standing behind him, that Aiken had suddenly reached around him, and that he had then heard a gunshot. Fitzwater also claimed that the gun trade had been completed earlier that day and that the Sig Sauer was Aiken's gun by that point.

*Fitzwater's Interactions with Other Inmates*

¶18    Fitzwater and Aiken were kept in the same jail while their cases were pending. Sometime in October 2018, Fitzwater asked his cellmate (Cellmate) to "lie" and say that Cellmate had overheard Aiken "admit" to Aiken's cellmate that he had shot the Victim. Fitzwater initially promised Cellmate $500 for telling this story, he later increased the offer to $20,000, and he later increased it again to "whatever he saved after his lawyer fees." Cellmate agreed to participate in this plan.

¶19    Fitzwater also recruited an inmate who was in the neighboring cell (Neighbor Inmate) to tell a similar story. By way of notes that were passed between the cells, Fitzwater asked Neighbor Inmate to say that he had also heard Aiken confess that he had shot the Victim. Fitzwater offered to put "money on" Neighbor Inmate's jail account for his help, and Fitzwater also offered to ensure that the victim from Neighbor Inmate's own case wouldn't show up to court. Like Cellmate, Neighbor Inmate agreed to participate in this plan.

¶20 Fitzwater set up interviews between a private investigator he hired and Cellmate and Neighbor Inmate, and both inmates told the private investigator the things that Fitzwater had asked them to say. Law enforcement soon heard about these claims, and when detectives interviewed Cellmate and Neighbor Inmate, the inmates told the detectives that they had heard Aiken confess to shooting the Victim.

¶21 Another inmate (Cooperating Inmate) was aware of what had happened, however, and Cooperating Inmate separately told authorities that Fitzwater had bribed Cellmate and Neighbor Inmate to give false accounts. When authorities confronted Cellmate and Neighbor Inmate about this, they each admitted that Fitzwater had bribed them to give false statements implicating Aiken.

¶22 The State later filed an amended information against Fitzwater that added one count of obstructing justice and two counts of witness tampering. The obstruction of justice charge alleged that Fitzwater had obstructed justice "on or about August 16, 2018," which, as noted, was the day of the early morning shooting, and it included the allegation that he had done so by providing "false information" to authorities. The witness tampering charges were based on the allegations involving Fitzwater's offers to Cellmate and Neighbor Inmate.

*Pretrial Stipulation Regarding Use of Aiken's Statements and Conviction*

¶23 As noted, Aiken and Fitzwater were charged as co-defendants. In February 2019, Fitzwater filed a motion to sever the two cases, this motion went unopposed by the State, and the district court granted that motion.

¶24 Aiken's case went to trial in June 2019. At Aiken's trial, the State alleged that Aiken was the one who shot the Victim, and it did so, in part, by pointing to evidence that it believed showed

that Aiken had been holding the gun as the men walked around the pond. Aiken testified at his trial, and the State challenged his credibility, in part, by pointing to his many shifting narratives about what had happened that night. At the close of trial, the jury convicted Aiken of murder.[3]

¶25 After Aiken was convicted, the State filed a motion to exclude evidence of Aiken's conviction in Fitzwater's case. Counsel opposed this motion, and Counsel also sought admission of Aiken's prior statements too. At a pretrial conference that was held in December 2021, Counsel and the State told the court that they were now jointly stipulating to the admission of "all of . . . Aiken's testimony, his prior interviews with the police, . . . any of [Aiken's relevant] jail calls," and "the fact that . . . Aiken was previously tried and convicted of murder."

¶26 In that hearing, Counsel told the court that this was "a strategic decision," that it was "well-advised," and that he had discussed the "potential trial strategies" involved in this decision with Fitzwater. Fitzwater was in attendance at the hearing, and he responded affirmatively when the court asked him if he had discussed this strategy with Counsel and if he was "satisfied with the advice" that Counsel had given him. Fitzwater also responded affirmatively when asked whether he agreed that the stipulation was for a "strategic reason." Finally, Fitzwater responded affirmatively when he was asked whether he understood that he would not be able to confront Aiken about Aiken's prior statements and that he was accordingly waiving his confrontation clause rights as to Aiken's statements against him.

¶27 This oral stipulation was later memorialized in a written joint stipulation that was filed with the court. In the written stipulation, Fitzwater further agreed to "waive any appeal for any

---

3. Aiken appealed his convictions, and this court affirmed them. *See State v. Aiken*, 2023 UT App 44, 530 P.3d 148.

issue concerning the admission of and effect of these statements at trial."

*Trial Strategies*

¶28    Fitzwater's case proceeded to a nine-day jury trial in February 2022. The State presented testimony about the events described above, including the evidence that was collected at the murder scene and elsewhere, as well as the various statements made by Fitzwater during the investigation. Pursuant to the stipulation, the State also played Aiken's several interviews with officers from the day of the murder in which Aiken accused Fitzwater of shooting the Victim. The State pointed out that Aiken said that the Sig Sauer belonged to Fitzwater and that he witnessed Fitzwater shoot the Victim. Later in the trial, the State read aloud the entirety of Aiken's trial testimony. The State also played excerpts from Fitzwater's interview where his attorney was present. And jurors also heard testimony from Cellmate, Neighbor Inmate, and Cooperating Inmate about Fitzwater's attempts to obtain false testimony from Cellmate and Neighbor Inmate.

¶29    In the defense's opening statement, Counsel pointed to evidence suggesting that Aiken was the one who shot the Victim. Counsel told the jury that it was Aiken who knew the area and that he went there "frequently"; that Aiken and Fitzwater completed the gun trade earlier that evening, which suggested, according to Counsel, that Aiken was in possession of the Sig Sauer at the time of the murder; that there was an imprint of the Sig Sauer's handle under Aiken's waistband; and that bullets matching the Sig Sauer were found in Aiken's pocket. Counsel emphasized that Aiken "was convicted of murdering" the Victim, stating that the parties "all agree[d] on that." Tying things all together, Counsel stated, "Where the gun was, who owned the gun, . . . where the bullets were. Dalton Aiken. Dalton Aiken. Dalton Aiken. That's the evidence about who pulled the trigger."

In terms of Fitzwater's involvement, Counsel then asserted that the question was not whether Fitzwater killed the Victim but whether Fitzwater was aware of Aiken's plan to kill the Victim, again placing the blame on Aiken.

¶30   During the defense's case, Counsel also emphasized Aiken's contradictory testimony, pointing out that he gave "at least four different stories in a half-hour interview." Counsel called a post-traumatic stress disorder (PTSD) expert who posited that Fitzwater suffered PTSD from prior traumas, and the expert then opined that this could have affected Fitzwater's memory after the shooting, thus explaining his answers from the initial interview.

¶31   During closing argument, Counsel reiterated that Aiken had been convicted of murder. Counsel then played a video compilation showing many of Aiken's contradictions and multiple stories. Counsel also read a portion of Aiken's trial testimony showing that the State's strategy at Aiken's trial was to accuse him of the murder.

*Relevant Procedural History Regarding Jury Instructions*

¶32   In both the initial information and the amended information, Fitzwater was charged as an accomplice to murder, while he was charged as a principal as it related to the firearm possession charge. As the case proceeded toward trial, it became clear the State intended to pursue alternative theories for these two charges—namely, that it intended to argue that Fitzwater was guilty as either a principal or an accomplice for both the murder and the firearm possession charge.

¶33   Counsel submitted proposed jury instructions a few months before trial. One of the proposed instructions for the murder charge would require jurors to be unanimous as to whether Fitzwater was guilty as a principal or instead as an accomplice. During a jury instruction discussion midway through

trial, the district court declined to give this instruction, citing the Utah Supreme Court's decision in *State v. Hummel*, 2017 UT 19, 393 P.3d 314, in support of its conclusion. In the final instructions that were given to the jury at trial, the jury was instructed that it could find Fitzwater guilty of murder as either a principal or an accomplice.

¶34    With regard to the firearm possession charge, Fitzwater's proposed jury instructions before trial did not include language asking for jurors to be unanimous as to principal or accomplice liability. In a separate filing, Counsel instead argued that party liability did not legally apply to this offense, and Counsel thus asked the court to strike that as an option at all. At trial, the court overruled the objection, and the final jury instruction on the firearm possession charge included theories of both principal and accomplice liability.

¶35    At trial, the court gave a general instruction on unanimity that included the following language:

> In the jury room, discuss the evidence and speak your minds with each other. Open discussion should help you reach a unanimous agreement on a verdict. . . .
>
> Try to reach unanimous agreement, but only if you can do so honestly and in good conscience. If there is a difference of opinion about the evidence or the verdict, do not hesitate to change your mind if you become convinced that your position is wrong. On the other hand, do not give up your honestly held views about the evidence simply to agree on a verdict, to give in to pressure from other jurors, or just to get the case over with. In the end, your vote must be your own.

> Because this is a criminal case, every single juror must agree with the verdict before the defendant can be found "guilty" or "not guilty." . . . [T]he verdict must reflect your individual, careful, and conscientious judgment as to whether the evidence presented by the prosecutor proved a crime beyond a reasonable doubt.

¶36　During a midtrial discussion about jury instructions, Counsel and the State made a record about an in-chambers discussion that had taken place the previous day. According to their account, Counsel had objected to one aspect of one of the proposed murder instructions, after which Counsel had affirmatively indicated that he had no further objections to the court's proposed instructions relating to the firearm possession charge, the obstruction of justice charge, or the general unanimity instructions.

*Convictions*

¶37　After the case was submitted to the jury, the jury convicted Fitzwater on all counts.

ISSUES AND STANDARDS OF REVIEW

¶38　Fitzwater first raises several issues relating to the jury instructions. As explained below, one of his issues was preserved. For this issue, we review the relevant ruling "under a correctness standard." *State v. Powell*, 2007 UT 9, ¶ 11, 154 P.3d 788 (quotation simplified). For Fitzwater's unpreserved issues relating to jury instructions, Fitzwater asks us to reverse for either plain error or ineffective assistance of counsel. Because these issues are raised for the first time on appeal and there is no lower court ruling to review, we decide them as a matter of law. *See State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416.

¶39 Fitzwater next argues that he received ineffective assistance when Counsel stipulated to the admission of Aiken's prior statements and trial testimony. Finally, Fitzwater argues that he received ineffective assistance when Counsel failed to file a motion to sever the two witness tampering charges from the other charges in his case. Again, because these ineffective assistance claims are raised for the first time on appeal, we decide them in the first instance as a matter of law. *See id.*

ANALYSIS

I. Unanimity Instructions

¶40 Fitzwater raises several issues relating to the jury instructions on unanimity. These include: (A) a challenge to the district court's denial of his request to instruct the jury that it must be unanimous as to whether Fitzwater was guilty of murder as a principal or instead as an accomplice; (B) a claim of either plain error or ineffective assistance relating to alleged defects in the general unanimity instruction; (C) a claim of either plain error or ineffective assistance based on the absence of a unanimity instruction on the firearm possession charge; and (D) a claim of either plain error or ineffective assistance based on the absence of a unanimity instruction on the obstruction of justice charge.

¶41 As an initial matter, we conclude that Fitzwater cannot assert claims of plain error relating to the last three issues. During a jury instruction conference at trial, Counsel affirmatively told the court that he had no objection to these instructions. "Under the doctrine of invited error, an error is invited when counsel encourages the trial court to make an erroneous ruling." *State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699. This occurs when a defendant "manifest[s] some sort of affirmative representation to the trial court that the court is proceeding appropriately." *State v. Popp*, 2019 UT App 173, ¶ 23, 453 P.3d 657. In the context of jury instructions, a defendant invites error when the defendant

"affirmatively approves of the jury instructions at trial." *State v. Alfatlawi*, 2006 UT App 511, ¶ 26, 153 P.3d 804 (quotation simplified); *accord State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742. Because Fitzwater (through Counsel) did this very thing here, he cannot assert plain error relating to these issues.

¶42 In light of this, we review the initial issue (which, again, was preserved) on the merits, and we review the other issues only for ineffective assistance.

A. Principal Versus Accomplice Liability

¶43 Fitzwater was charged with murder under Utah Code section 76-5-203(2). In the key part relevant to this appeal, the statute states that a person commits murder if he or she "intentionally or knowingly causes the death of another individual." Utah Code § 76-5-203(2)(a). The elements instruction that was given to the jury included these elements. As noted, the State asserted that Fitzwater was guilty as either a principal or as an accomplice, and the jury was instructed accordingly. Under the accomplice liability statute, "[e]very person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." *Id.* § 76-2-202. In this sense, "party liability, otherwise known as accomplice liability, is an alternate theory of liability under which a defendant is guilty of an offense when he acts with both the intent that the underlying offense be committed and the intent to aid the principal actor in the offense." *State v. Rogers*, 2020 UT App 78, ¶ 1 n.1, 467 P.3d 880 (quotation simplified).

¶44 During proceedings below, Fitzwater asked the district court to instruct the jury that it was required to be unanimous as to whether he was guilty as a principal or instead as an accomplice to murder, but the district court declined to give such an

instruction. Fitzwater now challenges that decision on appeal, but we see no error.[4]

¶45　The Utah Constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. This clause requires unanimity for "each distinct crime charged," and the jury must be "unanimous on all elements of a criminal charge for a conviction to stand." *State v. Hummel*, 2017 UT 19, ¶¶ 26, 29, 393 P.3d 314 (quotation simplified). But this clause does not require the jury to be unanimous "at the level of theory of a crime or means of fulfilling an element," nor is unanimity required "on every method or means of fulfilling each individual element of each crime in question." *Id.* ¶¶ 33, 80 (emphases omitted). Unanimity also is not required on "the precise manner in which the crime was committed" or on the "alternative methods or modes," *State v. Russell*, 733 P.2d 162, 165 (Utah 1987), nor is it required when a jury is presented with "two alternative[]" theories of mens rea, *State v. Powell*, 872 P.2d 1027, 1032 (Utah 1994).

¶46　The supreme court expounded on these principles at some length in *Hummel*. The issue there involved unanimity as it relates to the crime of theft. 2017 UT 19, ¶ 1. The court noted that, by statute, the elements of theft are that the defendant "'obtain[ed] or exercis[ed] unauthorized control over the property of another

---

4. As noted above, the jury was also given principal and accomplice instructions with respect to the firearm possession charge, but Fitzwater did not make a similar unanimity request about the instructions for that charge below. On appeal, Fitzwater asserts that such an instruction should have been given, and he asks us to review this omission for either plain error or ineffective assistance of counsel. For the reasons set forth below, however, we conclude that Fitzwater was not legally entitled to such an instruction. Thus, under either rubric, we reject the assertion that Fitzwater was entitled to a similar instruction for this charge.

with a purpose to deprive him [or her] thereof.'" *Id.* ¶ 19 (quoting Utah Code § 76-6-404). The court then noted that the statute lists several ways that a person can obtain unauthorized control over another's property, such as "extortion or deception," *id.*, and that the defendant in that case had been prosecuted under both theories, *see id.* ¶ 15. On appeal, the supreme court held that the jury was not required to be unanimous as to whether the defendant had committed theft by extortion as opposed to theft by deception. *See id.* ¶¶ 57–58. In the supreme court's view, extortion and deception are simply the "means of satisfying the criminal elements defined by the legislature," *id.* ¶ 61 (quotation simplified), and because they "are not and cannot logically be separate offenses"—i.e., theft by extortion and theft by deception are not "separate crime[s]" but instead constitute the "single offense of *theft*"—the jury was not required to be unanimous as to whether the defendant committed the crime in one way versus the other, *id.* ¶¶ 19, 21, 89 (emphasis added).

¶47    In the course of this analysis, the supreme court discussed, by way of illustration, how unanimity would work in a murder prosecution. *See id.* ¶¶ 51–52. The court noted that the key elements of murder are that the defendant "'cause[d] the death of another' either 'intentionally or knowingly.'" *Id.* ¶ 51 (quoting Utah Code § 76-5-203(2)(a)). The court then observed that although a defendant could in theory cause another's death through various "mechanism[s]," a jury would not be required to be unanimous about which mechanism the defendant had used in a particular case. *Id.* ¶ 52. In the court's view, "if the jury heard evidence that the defendant both poisoned the victim and tried to suffocate him with a pillow, there would be no requirement for the jury to agree on which mechanism was the ultimate cause of death." *Id.* This is so, according to the court, "because the precise mechanism of the cause of death is not an element of the crime of murder. All that matters under our substantive law is that the defendant caused death knowingly or intentionally." *Id.* (quotation simplified).

¶48     In light of these principles, we see no error here. Again, the key elements of murder at issue in this case were whether Fitzwater "intentionally or knowingly cause[d] the death of another individual." Utah Code § 76-5-203(2)(a). While Fitzwater contends that the jury needed to be unanimous as to whether he acted as a principal or instead as an accomplice, we disagree.

¶49     In several past cases, our courts have referred to accomplice liability as a "theory" of how the underlying offense was committed. *See, e.g.*, *In re D.B.*, 2012 UT 65, ¶ 41, 289 P.3d 459 (referring to the State's "theory of accomplice liability"); *State v. Briggs*, 2008 UT 75, ¶ 16, 197 P.3d 628 (noting that, at trial, "the State relied upon accomplice liability only as a theory for convicting [the defendant] of the crimes included in the information, and not as a separate offense"); *State v. Gonzales*, 2002 UT App 256, ¶ 8, 56 P.3d 969 (discussing how the State "pursue[d] an accomplice liability theory at trial"). But in *Hummel*, the supreme court held that "theories" are the analytical equivalent of "methods, modes, or manners of committing a crime," none of which are subject to the unanimity requirement. 2017 UT 19, ¶ 57 (quotation simplified).

¶50     We also note that in *Gonzales*, we held that accomplice liability is not "a separate offense from principal liability" for purposes of the constitutional right to notice of pending charges. 2002 UT App 256, ¶ 12. We held that this is so, in part, because "accomplices incur the same liability as principals." *Id.* While *Gonzales* was not a unanimity case, our conclusion that principal liability and accomplice liability do not constitute "separate offense[s]," *id.*, naturally ties into *Hummel*'s conclusion that unanimity is only required for "each distinct crime charged," 2017 UT 19, ¶ 26 (quotation simplified).

¶51     Finally, we note that several other jurisdictions have concluded that, under their own unanimity principles, a jury is not required to be unanimous as to whether a defendant is guilty

as a principal or instead as an accomplice. *See, e.g., People v. Jenkins*, 997 P.2d 1044, 1130 (Cal. 2000) ("The jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator." (quotation simplified)); *Ayers v. State*, 844 A.2d 304, 309 (Del. 2004) (holding that "a specific unanimity instruction is *not* required in every case where a defendant may be convicted as a principal or as an accomplice" (emphasis in original)); *Taylor v. State*, 840 N.E.2d 324, 334 (Ind. 2006) (discussing principal and accomplice liability theories and concluding that "the jury did not need to agree unanimously on which theory supported [the defendant's] murder conviction"); *Futrell v. Commonwealth*, 471 S.W.3d 258, 277 (Ky. 2015) ("Complicity is not a separate offense. It is rather an alternative theory of the charged offense."); *State v. Nguyen*, 2010 ME 14, ¶ 15, 989 A.2d 712 ("Accomplice and principal liability are alternate means for the commission of a single crime."). By contrast, Fitzwater cites no case that held that a jury must be unanimous on this point.

¶52  Pulling all this together, if a jury does not need to be unanimous as to "two alternative[]" theories of mens rea, *Powell*, 872 P.2d at 1032, and if a jury also does not need to be unanimous as to whether a murder defendant poisoned or instead suffocated the victim, *see Hummel*, 2017 UT 19, ¶ 52, then it seems to us that the jury in this case likewise did not need to be unanimous as to whether Fitzwater directly caused the Victim's death as a principal by shooting him or instead caused the Victim's death as an accomplice by soliciting, requesting, commanding, encouraging, or intentionally aiding Aiken in doing so. This is so because murder as a principal and murder as an accomplice are not "separate crimes" but are different ways of committing the "single offense" of murder. *Id.* ¶¶ 19, 54. In this sense, the differences between them go to the "manner in which the crime was committed," *Russell*, 733 P.2d at 165, or, instead, the "theory" or "means" or "method" of "caus[ing] the death," *Hummel*, 2017 UT 19, ¶¶ 31, 33 (quotation simplified). We therefore conclude

that the jury was not required to be unanimous as to whether Fitzwater was guilty as a principal or instead as an accomplice, so we accordingly see no error in the court's denial of his request for such an instruction.

B.      General Unanimity Instruction

¶53    Fitzwater next argues that he received ineffective assistance because Counsel did not object to certain alleged defects in the general unanimity instruction.

¶54    To prevail on an ineffective assistance claim, Fitzwater must show (1) that Counsel's "performance was deficient and (2) that the deficient performance prejudiced the defense." *State v. Meik*, 2024 UT App 46, ¶ 31, 547 P.3d 878 (quotation simplified), *cert. denied*, 554 P.3d 923 (Utah 2024). Fitzwater "must establish both prongs," and if "either is lacking, the claim fails and this court need not address the other." *Id.* (quotation simplified). To establish deficient performance, Fitzwater must show that Counsel's "representation fell below an objective standard of reasonableness." *State v. Samples*, 2022 UT App 125, ¶ 59, 521 P.3d 526 (quotation simplified). "Because the decision not to pursue a futile motion is almost always a sound trial strategy," Counsel's "failure to make a motion that would be futile if raised does not constitute deficient performance." *State v. Powell*, 2020 UT App 63, ¶ 20, 463 P.3d 705 (quotation simplified). To establish prejudice, Fitzwater "must show that there is a reasonable probability" that, but for Counsel's "unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (quotation simplified).

¶55    In Fitzwater's view, the general unanimity instruction was defective because it failed to inform jurors "what it meant to actually render a unanimous verdict," meaning that they were

"required to be unanimous as to each element of each count." We disagree.

¶56    "When reviewing jury instructions, we look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Devan*, 2024 UT App 193, ¶ 30, 562 P.3d 1233 (quotation simplified), *cert. denied*, 568 P.3d 261 (Utah 2025). Here, the general unanimity instruction told jurors that "[b]ecause this is a criminal case, *every single juror must agree with the verdict* before the defendant can be found 'guilty' or 'not guilty,'" that "the verdict must reflect [each juror's] *individual* . . . judgment as to whether the evidence presented by the prosecutor proved a crime beyond a reasonable doubt," that each juror's "vote must be [the juror's] own," and that "[o]pen discussion should help [the jurors] reach a *unanimous agreement* on a verdict." (Emphases added.) In addition, the separate elements instructions that were given for each count told jurors that they could only convict if they found that "*each and every one of the . . . elements*" of the counts was proven "beyond a reasonable doubt." (Emphasis added.) Taken together, these instructions clearly informed jurors that they needed to be unanimous as to each element of each offense.

¶57    Despite all this, Fitzwater claims that the general unanimity instruction was still flawed because it included a line telling jurors to "[t]ry to reach unanimous agreement, but only if" they could "do so honestly and in good conscience." According to Fitzwater, the word "try" suggested to jurors that they did not actually need to be unanimous. But again, jury instructions are read as a whole. Moreover, when assessing claims relating to perceived inadequacies in instructions, we're cognizant that "jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might; instead, we presume that jurors engage in a deliberative process in which a commonsense understanding of the instructions prevails over technical hairsplitting." *State v. Alarid*, 2022 UT App

84, ¶ 39, 514 P.3d 610 (quotation simplified). In light of the language recounted above—from both the general unanimity instruction and the elements instructions—that repeatedly and explicitly required jurors to be unanimous on the elements, we're not persuaded that the word "try" would have somehow communicated to them that there actually was not such a requirement.

¶58     Given this, we see no basis for concluding that Counsel overlooked a meritorious objection, nor do we see any basis for concluding that there's a reasonable probability that the verdict would have been different if Counsel had objected to the alleged inadequacies in the general unanimity instruction. This ineffective assistance claim fails.

C.     Firearm Possession Charge

¶59     In the firearm possession charge, Fitzwater was charged with violating Utah Code section 76-10-503(3), which stated that "[a] Category II restricted person who intentionally or knowingly purchases, transfers, possesses, uses, or has under the person's custody or control . . . any firearm is guilty of a third degree felony." Utah Code § 76-10-503(3) (2017) (repealed 2025). On appeal, Fitzwater claims that he received ineffective assistance because Counsel did not ask the court to instruct jurors that they had to be unanimous as to whether he "purchase[d], transfer[red], possesse[d], use[d]," or had under his "custody or control" "any firearm." *Id.*

¶60     On appeal, the parties disagree, for purposes of deficient performance, whether Fitzwater was even entitled to such an instruction. But we need not resolve that dispute here. This is so because we conclude that, even if Fitzwater was entitled to an instruction requiring unanimity on this front, Fitzwater has not shown that he was prejudiced by Counsel's failure to ask for it.

¶61    As explained, to prevail on his ineffective assistance claim, Fitzwater "must show that there is a reasonable probability" that, but for Counsel's "unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bonds*, 2023 UT 1, ¶ 53 (quotation simplified). For a claim such as this one, a defendant must "demonstrate that if the jurors were given a unanimity instruction, they would not have agreed that any one act amounted to" the charged offense. *State v. Medina*, 2025 UT App 99, ¶ 49, 574 P.3d 1011, *cert. denied*, 578 P.3d 749 (Utah 2025).

¶62    Here, the elements instruction for this charge told jurors that they must find that Fitzwater "[k]nowingly or intentionally purchased, transferred, possessed, used, or had under his custody or control any firearm." In that same instruction, jurors were also told that, as a separate element, they must find that Fitzwater was a "Category II restricted person." The next two instructions defined the various ways the State could prove that Fitzwater was a "Category II restricted person." This included evidence relating to his drug use. And of note, both of these instructions also required proof that Fitzwater was in "*possession* of a dangerous weapon" in connection with his possession of drugs. (Emphasis added.) Thus, while the broader elements instruction for the offense initially gave the jury options beyond "possession," the additional instructions that were also linked to this charge more narrowly required a finding of possession and possession alone.

¶63    And on this record, we see no real dispute that Fitzwater had possessed a firearm on the day and even in the hours immediately surrounding the shooting. As noted, Fitzwater told police that, at his house just a few "hours before" the shooting, he and Aiken traded guns—i.e., that Fitzwater gave Aiken his Sig Sauer in exchange for two rifles. Fitzwater admitted in his interviews that he had handled the Sig Sauer at some point that night. And Fitzwater also told officers that, after the shooting, he

saw the Sig Sauer on the seat of the truck and handed it to Aiken. When officers searched Fitzwater's house, they found the case for the Sig Sauer in his basement, along with several other guns too.

¶64 Based on the instructions that were given and the evidence presented at trial, we see no reasonable probability that the verdict on this count would have been any different if Counsel had requested a unanimity instruction on this charge. We therefore reject this claim for lack of prejudice.

D.     Obstruction of Justice Charge

¶65 By statute,

> an actor commits obstruction of justice in a criminal investigation or proceeding if the actor, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense:
>
> . . . .
>
> (b) prevents by force, intimidation, or deception, a person from performing an act that might aid in the discovery, apprehension, prosecution, conviction, or punishment of any person;
>
> (c) alters, destroys, conceals, or removes an item or other thing; [or]
>
> . . . .
>
> (j) provides false information regarding a suspect, a witness, the conduct constituting an offense, or any other material aspect of the investigation.

Utah Code § 76-8-306(2). The elements instruction given in this case for the obstruction charge included the above language. On appeal, Fitzwater argues that Counsel provided ineffective assistance by not asking for an instruction that would require jurors to be unanimous as to how Fitzwater had committed this offense. We reject this claim for lack of prejudice.

¶66    In past unanimity cases, we have concluded that the defendant was not prejudiced where the prosecutor made it clear at trial (usually in closing argument) which act was at issue. *See, e.g.*, *State v. Paule*, 2021 UT App 120, ¶ 48, 502 P.3d 1217, *aff'd on other grounds*, 2024 UT 2, 554 P.3d 844. We've likewise rejected claims where, on the facts presented at trial, we saw no reasonable probability that the defendant would have been acquitted on at least one of the variants that was submitted to the jury. *See, e.g.*, *State v. Mottaghian*, 2022 UT App 8, ¶¶ 59, 68–71, 504 P.3d 773.

¶67    Here, at trial, the State focused on two theories: (1) that Fitzwater "provided false information" to officers and (2) that Fitzwater concealed the gun. We see no reasonable probability that, if the jury had been instructed that it must be unanimous, it would not have convicted Fitzwater based on the false information theory advanced by the State.

¶68    As discussed, Fitzwater gave multiple accounts of what happened on the night of the murder. His accounts were decidedly varied and, in the end, transparently conflicting.

- At the initial traffic stop, Fitzwater told officers that he and Aiken were just "looking around" and "walking around." When an officer brought up the homeless people who lived near the pond, Fitzwater said they "only [saw] like, one bad person." He further said that he and Aiken "stayed on the main trail." Fitzwater said nothing at all about having encountered the Victim, much less about having been there when he was shot.

- In an interview at the police station later that day, Fitzwater again said that he and Aiken had stayed on the main trails, hadn't heard any gunshots, and hadn't gone into any homeless camps.

- Four months later, however, Fitzwater gave another interview, this time with an attorney present. In this interview, Fitzwater said that while he and Aiken were out walking near the pond, he saw a fire, at which point Aiken veered off the trail and Fitzwater followed him. Fitzwater then said that he saw the Victim sleeping on a mattress and nudged him with his foot, that the Victim mumbled something, and that Aiken reached around Fitzwater and shot the Victim.

¶69   Thus, in these interviews, Fitzwater gave directly conflicting information about (1) whether he and Aiken veered off the trail and (2) whether they saw or personally encountered a homeless person. Beyond that, in his initial account at the traffic stop, Fitzwater gave a decidedly incomplete story, insofar as he said nothing at all about having just been present at a shooting of a person near the pond, which one could reasonably regard as a lie by omission.

¶70   We've recently recognized that an obstruction conviction can be based on a defendant's initial lies to police, even where the defendant later told the truth. *See State v. Hernandez*, 2025 UT App 90, ¶¶ 35–36, 572 P.3d 1156, *cert. denied*, 574 P.3d 524 (Utah 2025). We have no difficulty concluding here that, by his own conflicting accounts, Fitzwater told officers things that were not true. As a result, we see no reasonable probability that a jury would have acquitted him of obstruction of justice even if it had been given a unanimity instruction as to this count. We therefore reject this ineffective assistance claim for lack of prejudice.

II. Use of Aiken's Statements and Conviction

¶71   As discussed, before trial, Counsel asked the court to admit evidence of Aiken's murder conviction. Counsel then entered a joint stipulation with the State that allowed for the admission of "all of . . . Aiken's testimony, his prior interviews with the police, . . . any of [Aiken's relevant] jail calls," and "the fact that . . . Aiken was previously tried and convicted of murder." In a pretrial hearing, Counsel told the court that this was "a strategic decision" and that it was "well-advised." Fitzwater also affirmatively agreed when asked if he was "satisfied with the advice" that Counsel had given him and whether he understood that there was a "strategic reason" for the stipulation.

¶72   Fitzwater now argues that the stipulation was "objectively unreasonable and not a matter of prudent trial strategy." Fitzwater argues that Aiken's statements were hearsay and thus inadmissible, and he further argues that Counsel's decision "relieved the State of its significant burdens" in proving its case. According to Fitzwater on appeal, Aiken's prior statements were "[t]he only direct evidence" that linked Fitzwater to the crime, so Counsel's stipulation gave the State a way of proving something that it could not otherwise prove. We disagree.

¶73   We have recently explained that when a defendant raises a choice-of-strategy claim like this one on appeal, "the relevant question is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial," but is instead "whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Florreich*, 2024 UT App 9, ¶ 59, 543 P.3d 795 (quotation simplified). Our supreme court has likewise cautioned that while "[i]t is easy to second-guess counsel's trial strategy from the rearview mirror of an appeal," appellate courts must not "evaluate counsel's conduct from [this] hindsight-biased vantage." *State v. Barela*, 2015 UT 22, ¶ 22, 349 P.3d 676. Instead,

courts must consider whether the approach chosen by the attorney "was reasonable at the time" the attorney made the decision. *Id.*

¶74 Moreover, we have recognized that the ineffective assistance standard "is a most deferential one" and takes into account the understanding that "even the best criminal defense attorneys would not defend a particular client in the same way." *State v. Wright*, 2019 UT App 66, ¶ 30, 442 P.3d 1185 (quotation simplified). Our supreme court has thus held that "[i]f it appears counsel's actions could have been intended to further a reasonable strategy," the "defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Indeed, *Strickland v. Washington* itself stated that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. 668, 690 (1984).

¶75 When Fitzwater's claim is assessed under these principles, we see no deficient performance. Fitzwater's claim on appeal is focused on Aiken's prior statements, and he asserts that without them, the State had no way of linking Fitzwater to this crime. But this is simply not so. Even without Aiken's statements, the State could prove the following things through other evidence and testimony:

- After a night of drinking, Fitzwater and Aiken went walking at 2:00 a.m. in a secluded and forested area that was known to be a place where homeless people often slept.

- Fitzwater and Aiken brought the Sig Sauer with them on this walk.

- Fitzwater owned the Sig Sauer at least up through that evening. While it appears that Fitzwater intended to trade it to Aiken, there was some indication that the trade had

not yet been completed, including the fact that the gun's case was found in Fitzwater's home the next day.

- While walking, Fitzwater and Aiken at some point left the trail and proceeded through "very thick" brush in an area that had "no path."

- According to statements Fitzwater made to officers four months after the shooting, the two men entered into a campsite where they found the Victim sleeping, at which point Fitzwater saw the Victim and nudged him with his foot.

- The Victim was then shot with the Sig Sauer that, again, had belonged to Fitzwater at least up through that evening.

- A short time later, Fitzwater and Aiken were seen driving away from that same area, and they were pulled over by an officer who knew nothing about the shooting.

- Although the officer pulled the truck over for what he thought was a marijuana offense, and although Fitzwater was a passenger in the truck, Fitzwater immediately raised his hands and then kept them up, which appeared to the officer as if Fitzwater expected to be searched. Even after the officer told Fitzwater to "relax," Fitzwater maintained that posture. Later, unprompted, Fitzwater put his hands behind his back as if he expected to be handcuffed.

- When officers searched the truck, they found the Sig Sauer behind the passenger seat, which was where Fitzwater was sitting, and they found a magazine and an extra round for the Sig Sauer on that seat. Officers also found a ski mask with debris on it in front of the passenger seat.

- Fitzwater omitted several key details when speaking to officers at the traffic stop. In this and subsequent

interviews, he affirmatively changed his story about several key details, meaning that, at some point, he was lying to officers about the events he had been involved in on the night of the shooting.

¶76 When considering evidentiary questions, jurors are allowed to draw reasonable inferences from the evidence, and they're also allowed to use common sense. *See, e.g.*, *State v. Ashcraft*, 2015 UT 5, ¶ 37, 349 P.3d 664; *Herzog v. Vail Resorts, Inc.*, 2025 UT App 69, ¶ 55, 572 P.3d 402. "It is the exclusive province of the jury to weigh the competing theories of the case, in light of the evidence presented and the reasonable inferences drawn therefrom, and to conclude which one they believe." *State v. Cardona-Gueton*, 2012 UT App 336, ¶ 11, 291 P.3d 847 (quotation simplified). Moreover, "direct evidence is not required to support a conviction, and sustainable verdicts are entered every day on the sole basis of circumstantial evidence." *State v. Suhail*, 2023 UT App 15, ¶ 110, 525 P.3d 550 (quotation simplified).

¶77 Taken together, these facts could have allowed jurors to conclude that Fitzwater was linked to the murder. They (1) placed Fitzwater at the scene of the murder at a time and place that were hardly indicative of happenstance; (2) directly linked him to the murder weapon; (3) showed that at the time of the traffic stop, he seemed to think he was about to be arrested; and (4) established that he repeatedly engaged in deceptive and obfuscatory behavior when speaking to authorities afterward.

¶78 This was the factual picture that confronted Counsel as he was deciding on a defense strategy for trial. Faced with these facts, Counsel decided on essentially a two-pronged approach.

¶79 First, Counsel did not try to claim that Fitzwater wasn't there that night. He couldn't plausibly do so, given all of the above. Instead, he chose to assert that Aiken, not Fitzwater, was the shooter and to thus place the blame on Aiken. Counsel sought to prove this, in part, by affirmatively using the fact of Aiken's

prior conviction and what happened at Aiken's trial in support of Fitzwater's theory. As part of this approach, Counsel pointed out to the jury that the very same prosecutor's office that was now prosecuting Fitzwater had argued to Aiken's jury that *Aiken* was the shooter.

¶80    Second, while acknowledging that Aiken had pointed the finger at Fitzwater, Counsel then used Aiken's own conflicting and evolving statements to assert that everything Aiken had said was simply a lie. In support of all this, Counsel read Aiken's trial testimony to the jury, in part to again show that the prosecution in Aiken's trial had blamed Aiken for the shooting. And Counsel presented in closing argument a video featuring a combination of Aiken's various contradicting statements to police.

¶81    As we've previously explained, "an attorney must play the hand he or she is dealt, and an attorney's decision about how to deal with adverse facts is the sort of thing that courts should not second-guess in the context of ineffective assistance claims." *Florreich*, 2024 UT App 9, ¶ 60 (quotation simplified). And again, informed strategic decisions are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. On this record, we think it's clear enough that Counsel made an informed decision about how to deal with the adverse evidence that already linked Fitzwater to the murder scene, the murder weapon, and, by implication, possibly the murder itself, and Counsel's chosen approach involved using Aiken's statements and conviction in an attempt to cast the blame solely on him. We see no basis for concluding that this approach was objectively unreasonable and that it therefore constituted deficient performance.[5]

---

5. A few final points regarding this issue warrant brief mention. First, as noted, Fitzwater claims that Aiken's statements were "all inadmissible hearsay." But even if this were true, cases establish

(continued…)

### III. Severance of the Witness Tampering Charges

¶82 Finally, Fitzwater claims that Counsel provided ineffective assistance by not moving to sever the witness tampering charges from the other charges. We disagree.

¶83 By statute, two or more charges can be joined if they are "based on the same conduct or are otherwise connected together in their commission" or are "alleged to have been part of a common scheme or plan." Utah Code § 77-8a-1(1)(a)–(b).

---

that a defense attorney can reasonably decide to use otherwise inadmissible evidence in pursuit of a strategy. *See, e.g., State v. Bullock*, 791 P.2d 155, 157–58, 160 (Utah 1989).

Fitzwater also points out that as part of the pretrial stipulation, he agreed to waive his right to later assert ineffective assistance regarding Counsel's chosen approach. In light of this, Fitzwater next claims that this waiver created a conflict of interest for Counsel, thereby implicating a different ineffective assistance standard. *See generally Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). But Fitzwater's briefing on how this different standard would apply to this case is cursory, so for this reason, we conclude that he has not carried his burden of persuasion on this point.

Finally, again pointing to the ineffective assistance waiver, Fitzwater claims that it's unethical to ask a defendant to agree to waive his or her right to later assert ineffective assistance, and though a touch unclear, he seems to also suggest that such a waiver is invalid. But in its responsive brief, the State did not seek to enforce this waiver; rather, the State simply contended that Fitzwater has not shown that he received ineffective assistance in this case. Because we agree with the State that Fitzwater has not shown ineffective assistance, we need not decide the question of whether such a waiver can be enforced. And because this appeal is from Fitzwater's criminal conviction, not an ethics decision relating to Counsel's performance, it's not necessary for us to decide the ethical propriety of such waivers to resolve this appeal.

"Charges are connected in their commission when there is a direct relationship between them, often because the conduct resulting in one charge was precipitated by conduct resulting in another charge." *State v. Burke*, 2011 UT App 168, ¶ 21, 256 P.3d 1102 (quotation simplified).

¶84  "For a joinder to stand," it must also "meet the prejudice prong of section 77-8a-1." *State v. Lim*, 2022 UT App 69, ¶ 34, 513 P.3d 72 (quotation simplified). That provision states that if

> the court finds a defendant or the prosecution is prejudiced by a joinder of offenses or defendants in an indictment or information or by a joinder for trial together, the court shall order an election of separate trials of separate counts, grant a severance of defendants, or provide other relief as justice requires.

Utah Code § 77-8a-1(4)(a). In assessing prejudice, the "threshold inquiry" is therefore "whether evidence of the other crime would have been admissible in a separate trial." *State v. Lee*, 831 P.2d 114, 118 (Utah Ct. App. 1992). "For example, evidence of the second offense may be admissible to show the defendant's guilty conscience related to the first offense." *State v. Smith*, 927 P.2d 649, 653 (Utah Ct. App. 1996). "Likewise, evidence of the first offense may be admissible to show the defendant's motive for committing the second offense—i.e., to conceal criminal activities." *Id.* Because such a scenario seems to involve the use of other bad acts, it likely implicates, of note, rules 403 and 404 of the Utah Rules of Evidence. *See Lim*, 2022 UT App 69, ¶ 34. Thus, to prevail on an improper joinder claim, the defendant must ordinarily show that "the evidence of the . . . charged crimes would not have been admissible at separate trials because its probative value was substantially outweighed by the danger of unfair prejudice." *Id.* ¶ 36.

¶85    Our decision in *Smith* is instructive as to how these principles play out in a case like this one. There, the defendant hosted a gathering in which several people ingested illegal drugs. *See Smith*, 927 P.2d at 650. One of the guests died of an overdose in the middle of the night; after his body was discovered, and before calling for help, the defendant directed others to gather evidence of the illegal drug use and then throw it away in a nearby dumpster. *See id.* at 650–51. The defendant was later charged with both manslaughter and evidence tampering. *See id.* at 651. The jury acquitted him of manslaughter, but it convicted him of evidence tampering. *See id.*

¶86    On appeal, the defendant challenged a pretrial decision from the district court that denied his request to sever the two charges. *See id.* at 652. But we affirmed the district court's decision. *See id.* at 655. We held that the case involved a "precipitation situation" because the defendant threw away the drug evidence in an attempt to "conceal the illegal drug activities that caused him to be charged with" manslaughter. *Id.* at 653. We also observed that evidence of each offense would have been admissible at a trial on the other. For example, we concluded that evidence of the defendant's involvement in the alleged manslaughter "tend[ed] to show [his] motive for evidence tampering." *Id.* And we likewise concluded that the defendant's attempt to conceal the drug paraphernalia "tend[ed] to show consciousness of his potential guilt regarding manslaughter." *Id.*[6]

---

6. Of some note, courts from other jurisdictions have reached similar conclusions in similar cases. *See, e.g., United States v. Bourassa*, 411 F.2d 69, 74 (10th Cir. 1969) ("While bail jumping was a separate offense, proof of it was not prejudicial in the counterfeiting case where flight was a circumstance that might be considered in determining guilt."); *State v. Bravo*, 639 P.2d 358, 359 (Ariz. Ct. App. 1981) ("Evidence that a defendant attempted to

(continued…)

¶87　We reach the same conclusions here too. First, we agree with the State that these offenses were connected in their commission. As discussed, after Fitzwater was charged with murder, and while he was in jail awaiting trial on that charge, he allegedly tried bribing two fellow inmates to give false testimony implicating Aiken in the shooting. In this sense, the murder charge clearly precipitated the conduct at issue in the witness tampering charges because it provided the motive for the alleged conduct. And evidence of the alleged witness tampering likewise could have been used to show that Fitzwater had a "consciousness of his potential guilt" for the murder. *Id.*

¶88　For similar reasons, we also conclude that Fitzwater has not shown that he suffered any prejudice. Fitzwater claims that allowing the State to use evidence of the witness tampering in the trial for murder violated rule 404(b) of the Utah Rules of Evidence. We disagree. Under that rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). But the State didn't seek to use the evidence here to show character or conformity—i.e., the State wasn't arguing that because Fitzwater was the kind of person who commits murder, he was also the kind of person who commits witness tampering (or vice versa). Rather, the State was arguing that the pending murder charge was the motive for Fitzwater to engage in the conduct that led to the witness tampering charges. And the State further argued that the witness tampering conduct suggested that Fitzwater was conscious and aware of his guilt with respect to the murder

influence the testimony of a witness against him tends to show a consciousness of guilt."); *State v. Bingman*, 745 P.2d 342, 347 (Mont. 1987) (holding that an assault charge and a witness tampering charge "were properly joined" where the "assault charge provide[d] a motive for and precipitate[d] the tampering charge").

charge. Under rule 404(b), "motive" and "intent" are permissible purposes for admitting such evidence. *Id.* R. 404(b)(2).

¶89    As noted, "counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." *Powell*, 2020 UT App 63, ¶ 20 (quotation simplified). In our view, the proposed motion to sever the witness tampering charges from the other charges would have been futile. We accordingly reject this claim for lack of deficient performance.

## CONCLUSION

¶90    Fitzwater has challenged his convictions on many grounds, but we see no reversible error on any of them. His convictions are therefore affirmed.

––––––––––